231565 James Harper v. Daniel I. Werfel, et al. Will Attorney Sheng Li please step up and introduce yourself for the record? May it please the Court, Sheng Li from the New Civil Liberties Alliance. For James Harper Appellant, I'm here with my colleague Richard Samp. I'd like to reserve two minutes for rebuttal, please. Yes, you may. Your Honors, the John Doe summons here asks for tax all information, financial records information, regarding taxpayers who conducted virtual currency transactions between 2013 and 2015, all of them. Congress and the Constitution prohibits this very type of phishing expedition into the financial records of, here quite literally, millions of taxpayers without any individualized suspicion of tax evasion. Counsel, can I ask you, what is the investigative scheme, if you will, or regimen that you think would meet the Constitutional requirements that you see? If we were to rule in your favor, what would be left of the IRS's investigative powers? What would be the regimen that would then apply? What is your objective here? Well, first, we think there should at least be individualized suspicion of wrongdoing, again, on an individualized basis. And that's actually required by the statute here as well as the Fourth Amendment. And turning to that statute, Congress enacted Section 7609F specifically to provide that protection for John Doe taxpayers. So this entire John Doe summons process would be gone. Is that correct? No, Your Honor. It's antithetical to the idea of individualized suspicion, is it not? Not at all, Your Honor. Under Section 7609, what the IRS has to do is demonstrate, one, that there's an ascertainable group of individuals and, two, whom they suspect reasonably to have committed some sort of tax evasion. Now, they could suspect, you know, as the legislative history of that provision says, they could suspect, for example, all shareholders unidentified of a particular tax reorganization fail to pay their taxes. They could send John Doe summons and obtain one for that sort of inquiry into an identifiable, ascertainable group that they have a reason to believe evaded taxes in some way. Here, what they're claiming is the ascertainable group is millions of individuals based solely on their use of cryptocurrency. And the basis of reasonable belief is that some of them, sure, some of them may be committing tax evasion. But through the enforcement process, the ascertainable group was significantly narrowed. It was not, to your satisfaction, I understand that, but it was significantly narrowed, was it not? That's not quite so, Your Honor. The narrowing of the summons to Coinbase was based on Section 7602 criteria, not 7609F criteria. And here, the magistrate that approved the IRS summons approved it based on the IRS's claim that the ascertainable group consists of all cryptocurrency transaction users between 2013 and 2015, which, you know, at the time, Coinbase, just Coinbase, had over a million users. So over all taxpayers in the United States, that would have been, you know, quite a bit over that amount and probably many millions. We don't have the precise number in the record, but I would think many millions. Let me ask you, since you mentioned the magistrate judge who dealt with this, and I believe it was in California, correct? That's right. Aren't you, isn't this sort of like a collateral attack on what happened in California? Not so, Your Honor. That's because Appellant Harper here had no ability to really intervene in that case. For one, he was not even aware that his records were covered under that Coinbase summons. Coinbase had actually said that it would advise all Coinbase customers if their records were subject to the summons, and Harper never received any such indication. When you say his records, you don't really mean his records to you. You mean Coinbase's records of its transactions that he undertook. Again, Your Honor, there's a contract between Coinbase and Mr. Harper here, and the contract specifies that the records and information that uses the second person possessive to refer to financial records and financial information regarding Mr. Harper's Coinbase account, they're his records. It says Coinbase will promise us to protect your records, your information, indicating those records are his. They belong to him. Coinbase may be using them for certain purposes. It may be keeping them safe and secure on behalf of Mr. Harper, but at the end of the day, those records are his. You could say the same thing with bank records. I'm sorry. I don't quite follow that. Sure. You could say my bank has my records. I think it would depend precisely on what the contract with you and your bank says at that point. If the contract says these are the bank's records and we use them in this way and they don't belong to the bank account holder, that would be one thing. But if the bank's contract says we recognize these are your records and you have a property interest in what's here, then I think the bank account holder would have a possessory interest in those records. So if your client had told Coinbase give me all the records and don't keep any copies, Coinbase would have had to do that? Well, he can certainly require Coinbase to give him all the records. But Coinbase could, notwithstanding whatever your client wanted, Coinbase could keep the records? Pursuant to the agreement, that's fair, Your Honor. So they had their own copy that they had a right to possess whether your client agreed or not? Again, that's pursuant to the terms of the agreement. And as we know, property rights can be divided in various ways. So the fact that Harper didn't have exclusive control over the records in no way means he has no property interest whatsoever. And the property interest, that amount of property interest, is sufficient to trigger Fourth Amendment scrutiny under the bailment theory that Justice Gorsuch proposed in the Carpenter decision. And I would like to add, by the way, in that case which would reach concerned cell site information, Justice Gorsuch posited that that cell phone user would have a property interest, even though, as we know, most cell phone agreements do not allow users to obtain cell site information from AT&T and whatever provider they have, whereas here, Mr. Harper had greater property interest because he could obtain periodic monthly statements and whatever he wants, really, from Coinbase regarding his records at Coinbase. Let me ask you, you mentioned Justice Gorsuch's concurrence, but aside from that, do you have any other recent authority that supports you, or are you relying mainly on that? We're relying mainly on that, Your Honor. We'd like to note that's a fairly recent case, and there hasn't been a lot of opportunity for that theory to develop and percolate through the lower courts. Counsel, when you refer to individualized suspicion, it sounds to me like you're trying to import into this investigative scheme a probable cause standard which PAL explicitly says does not apply to this IRS investigative procedure. How do you reconcile your position with what the Supreme Court said in PAL? Well, to start, I think I would make two points, Your Honor. The first is, in PAL, the Supreme Court was not considering a Fourth Amendment challenge. It was instead considering a challenge under 7602 of the Internal Revenue Code, and so there was no discussion. The parties never argued. It seems to me that PAL could be read as establishing a standard of reasonableness, which is a Fourth Amendment standard, as distinct from the probable cause requirements. So why can't PAL fairly be read as establishing a reasonableness standard that is compliant with the Fourth Amendment? For sure, Your Honor. Even if you were to read PAL in that way, which we don't, but even if you were to read PAL that way, Your Honor, PAL concerned whether or not probable cause was necessary and said no. Here, we're not saying IRS necessarily has to meet probable cause, but individualized suspicion is a lower standard than that, and IRS fails even that and certainly can't have an individualized suspicion with respect to, you know, quite literally millions of taxpayers. I see my time is up. If you have further questions, I'd like to save the rest for rebuttal. Thank you. Thank you. Will Attorney Lyon please come up and introduce yourself for the record? Thank you, Your Honor, and may it please the Court. My name is Kathleen Lyon, and I represent Daniel Werfel in the IRS. In this case, Mr. Harper's brought, of course, three claims, and in our view, he doesn't have a protected interest under either the Fourth or the Fifth Amendment, and the statutory claim fails because 7609F does not provide any cause of action there and neither does the APA. In getting to some of the points that have already been made here, in terms of his property interest that he claims, he simply doesn't have one under this case. These are Coinbase's business records of its transactions with him or his transactions at their site. Coinbase created the records. It maintained the records. It possesses the records. It controls the records. I don't think there's anything unusual. These are standard records that it keeps. Moreover, the records that it has to keep, many of them it has to keep under the Bank Secrecy Act, which is essentially why it is very, very similar to banks and to bank records, and that's the basis for our view that there's no privacy interest either. With respect to Powell, Mr. Lee just said that they're not saying that the government has to meet probable cause. That has been their argument all along, which is their complaint was that the government obtained the information without a warrant based on probable cause. He's now reduced that to individualized suspicion in some way, but individualized suspicion is not necessary. Certainly under the contract, whatever the contract says about your property or not, the contract speaks for itself that Coinbase was able to share this information pursuant to complying with a court order, which is exactly what happened here. Counsel, this is on the reasonable expectation of privacy issue. You clearly take the view that Mr. Harper made a choice to work with the currency exchange in deciding to involve himself in cryptocurrency. On any realistic view, if he wanted to engage in cryptocurrency transactions, didn't he have to work through an exchange? Is there really any way in which realistically he could participate in these blockchain transactions without working through a currency exchange? Well, he could have done peer-to-peer transactions. I'm sorry? Peer-to-peer transactions, which is most of what the amicus briefs are talking about. They're peer-to-peer transactions. I mean, as originally designed, as I understand it, the peer-to-peer transactions occur via software that you can put on your computer and it deals with other people on their computers, and it's sort of this private kind of thing. Although the blockchain itself is public, but the actual transactions you can do from your home if you have that proper software. But with the exchange, I don't know why he made the choice one way or the other. Perhaps he thought there was some convenience there to him. But it was definitely his choice, and he has conceded that he voluntarily exposed his information there. And if there's any doubt about that, he says that on reply brief page six. He says, you know, he just says it doesn't matter that he voluntarily exposed his information there. But that's not what Carpenter says. It was a key consideration in Carpenter that there was no voluntariness to the exposure of that information because the very use of a cell phone itself just kicked in with all of this data being collected on somebody. And so that was one of the more important points in Carpenter. But they make the point that the consequences of revealing the identity of the individual and all the information that goes with it completely destroys the anonymity that the blockchain provides. And in that sense, it's comparable to Carpenter because you could reconstruct from all of these detailed account information all of those personal life details that the Supreme Court worried about in Carpenter. Why isn't that a – why doesn't that argument have some force, that the consequences here are very similar to what the Supreme Court worried about in Carpenter? Sure. I think – I don't think that has as much force in this case because I think what they're talking about is if you have the wallet address, if you have the public key, then you could go on the blockchain and find out a lot about somebody. The IRS did not get that here. It did not get wallet addresses. It did not get public keys. It asked for those, but it didn't get them in the summons that was actually enforced. That was because of the narrowing that took place from the enforcement? Correct. Yes. If you look at the enforcement order, there's a section that says narrowed summons, which is the one that the IRS narrowed from its original summons. And in there you'll see a list of what it's asking for, including wallet addresses and public keys. And then if you go to the end of that enforcement order, there's a list of what the IRS actually got. And it was just basically the account, you know, identifying information, like as you would give any bank, you know, your name, your address, your date of birth. It got transaction information in terms of the buying, selling, and exchange of Bitcoin. Of course, he only bought and sold here. He didn't do anything else. He wasn't exchanging with third parties to get a service or a good. He just bought and sold Coinbase with Coinbase itself. And it also got periodic account statements, just like you could at any bank. But didn't you get information that would now allow you to determine all of the transactions that Mr. Harper had engaged in in the blockchain? Didn't you now have that information so that the anonymity that he previously had was now gone? Isn't that true? The IRS got transaction logs, which may allow you to sort of follow a transaction. But I don't think that that would have revealed everything about his activity anywhere on the blockchain with anyone. I mean, he was at Coinbase pretty much only during the period that was covered by the Sevens. He opened his account in 2013. He liquidated almost everything in 2015. By early 2016, he was gone. And so what he was doing elsewhere on the blockchain with other currency exchanges, I don't know why that would be revealed by having a transaction log for a particular transaction at Coinbase. But in any event, even if it were traceable, the information that would be available on the blockchain is not a detailed log of a person's movements over several years. I mean, what the government was concerned about was physical location surveillance, sort of this moment-by-moment tracking of someone. And that isn't going on here. What is available on the blockchain, if you look at public blockchain, is the amount of the transaction and the sender's wallet address or public address and the receiver's public address. Well, your bank records that are obtainable under Miller are going to have a huge amount of information in them, such as all your checks and who the payees were. Right. It absolutely would tell you perhaps, you know, you've made donations to this group or that political candidate or you've paid this bill to that doctor. And so the fact that some, you know, intimate information might have been gained here is not enough to justify not being able to get the transaction information, which is precisely the transaction information that is covered by the Bank Secrecy Act and which is exactly the transaction information that Mr. Harper, in his amended complaint, says that he relied on in filing his returns and is filling out his returns. So there's no dispute here that what actually was obtained, these currency transactions, relate to taxable events. Because when you buy or sell Bitcoin or you exchange it for property or services, there are values involved and you either have a gain or a loss and all of that is relevant to figuring out the tax situation. Counsel, you distinguish in your briefing between you call this, talk about the John Doe summons process, sort of a preliminary investigative phase and it's not accusatory. Isn't that a little bit disingenuous? I mean, the whole purpose of the investigation is to determine whether the IRS should move to really an accusatory process that might involve civil or criminal proceedings. So it's all in the context of possible civil or criminal charges. Is it not? Well, in a given case, perhaps down the line, if the IRS gets the information and it shows something, maybe it would result in that. But the Supreme Court has been very clear that the government doesn't need probable cause precisely because it's investigating. It's not yet accusing anyone of anything. If the Court has no further questions. Thank you. Well, Attorney Lee, please reintroduce yourself for the record. You have a two-minute rebuttal. Sheng Li for appellant. Your Honor, I'd like to start with this idea of what we just heard, that the information doesn't allow IRS to pierce the anonymity of Harper and others. That's simply just not true. I mean, it contradicts what's in the complaint. And to the extent there's a factual dispute, that inference comes with us because we are at the motion-to-dismiss stage. Our understanding is that these access keys were disclosed as part of the transaction logs that the IRS is able to either directly figure out the identities of users of the blockchain or through easy, commercially-available software, reverse-engineer their identities. And that's in the complaint. And I believe this is the first time that the government has ever raised this particular argument here. The argument that you've advanced of individual suspicion, I didn't see that in your brief for us. Your Honor, that is in the brief. It's certainly in the reply brief. It's in our statutory argument, certainly. Was it raised below? Yes. It's been raised below. At the very least, yes. It's in our district court brief, both for the Fourth Amendment and for the 7609F2 argument regarding what level of suspicion and reasonable belief there needs to be. And I also just want to add that – So you say it's in your reply brief, but it's not in your opening brief. I would have to look, Your Honor, but I believe, referring to my suspicion or reasonable suspicion, you can find that in our opening brief. I don't have the opening brief in front of me, so I can't give you the pin-side on this. But I want to turn back to this idea of reasonable expectation under Carpenter. And it's not just – in addition to the very intimate nature of an entity that is pierced, the third-party doctrine has never been used to – I see my time has finished. You can finish your thought. It has never been used to authorize kind of the drag-net fishing expedition-style surveillance over a huge number here, thousands or millions of individuals. And we ask the court not to expand that doctrine to this new context. We ask the court to reverse and remand this case. Thank you. Thank you. That concludes arguments in this case.